**MASSACHUSETTS BONDING & INS. CO. v. RAY DILSCHNEIDER, Inc.**

No. 14644.

United States Court of Appeals Eighth Circuit.

April 16, 1953.

Rehearing Denied May 9, 1953.

Thomas Rowe Schwarz and John S. Leahy, St. Louis, Mo., for appellant.

Elliott P. Koenig, St. Louis, Mo. (Leonard E. Martin and Rassieur, Long & Yawitz, St. Louis, Mo., on the brief), for appellee.

Before SANBORN, JOHNSEN and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

A general contractor sued a surety company upon the performance bond executed by it for a subcontractor, to recover the damages alleged to have resulted from the subcontractor's attempted cancellation of his contract to provide the aluminum window structures for two buildings being erected by the general contractor at the Southeast Missouri State Teachers College in Cape Girardeau, Missouri. A jury returned a verdict for the plaintiff, on which the court entered judgment, and the defendant has appealed. The case is admittedly ruled by Missouri law.

The first contention urged for reversal is that the subcontractor's refusal to furnish the windows could not under the terms of the contract be claimed to constitute a renunciatory breach but was required as a matter of law to be held to represent a rightful cancellation of the agreement, and that the trial court therefore erred in not granting defendant's motion for a directed verdict.

The cancellation clause of the contract was the subject of a sharp dispute in interpretation by the parties on the trial. The court concluded that, on the language used, the circumstances shown, and the other extrinsic evidence adduced, it was a question for the jury to say what the contract should be found to be, as a matter of whether the parties had provided for such a right of cancellation as the subcontractor claimed or whether the attempted cancellation was in fact a wrongful repudiation of the obligation of the agreement.

The cancellation clause was in the following language: "Contract may be cancelled by Sub-Contractor if Architect does not approve our standard construction, as per sample submitted." The architect's specifications had called for windows of various series types, "as manufactured by the General Bronze Corporation of Long Island City, New York, or an approved equal." The windows of General Bronze Corporation were a patented structure.

The subcontractor here involved was engaged in the business of selling an unpatented aluminum window structure, which he had manufactured for him by various factories and which he marketed as his own trade product.

Under the architect's general specifications, shop drawings and sample of such make of window, other than that of General Bronze Corporation, as the general contractor might desire to use, were required to be submitted to the architect for approval. And the contract entered into between the subcontractor and the general contractor was conformingly made to provide that the subcontractor should submit shop drawings and "also a full-sized sample of Double Hung Window", for the architect's examination and approval. Both a heavier and a lighter type of the double hung window was to be used in the buildings, and the subcontractor promised to submit a sample structure of each.

Shop drawings and a construction sample of the heavier type of window were thereafter submitted by the subcontractor, although not by the date called for in the contract. In the form and condition in which the sample was submitted, the architect refused to approve it as satisfactory or as representing a compliance by the subcontractor with the obligation of his contract. Testimony for the plaintiff showed that the corner welds of the sample were "crude and had not been polished or rubbed down;" that felt had been used in the structure for weatherstripping instead of stainless steel, which the subcontractor had represented in his trade advertising,[1] as well as indicated in the shop drawings furnished by him, constituted part of his window construction; and that the workmanship involved in the placement of the lock in the sample had been such that the window of the structure could not be made to fasten securely.

All of these objections were pointed out by the architect to the subcontractor, and the subcontractor unprotestingly agreed to have them remedied and to re-submit the sample for approval after this had been done. He also agreed at the architect's request to change the balances on the window from spring to spiral type, though this detail is not claimed to be of any significance here.

The subcontractor however never made any correction or resubmission of the sample, as he had agreed. A sample structure of the lighter type window to be used, which he also had promised to submit and which he had had another factory make up for him, was within a short time transmitted to the architect. This sample too the architect refused to approve, until two or three things were corrected. Thus, for example, just as in the case of the heavier-window sample, felt had been used in part for weather-stripping instead of stainless steel. Upon receipt of these criticisms from the architect, the subcontractor sent the general contractor the following telegram: "* * * we hereby cancel the contract because of the failure of the architect to approve sample submitted."

It was the subcontractor's position, and also that of the surety company here, that the contract gave the subcontractor an absolute right of cancellation, if the architect failed to approve any window sample which he might submit. The general contractor on the other hand contended that

---

1. The evidence showed that the subcontractor had advertised his general product in "Sweet's Catalog" as "Stormtite Aluminum Windows" and had included in his description, among other things, the following: "All Stormtite window frame and sash members are extruded from 663 S X S Alcoa aluminum, with corners welded together. All weather stripping and balances are of stainless steel. Stormtite windows are furnished in standard finish extruded, unless otherwise called for."

There was testimony that Sweet's Catalog was the recognized standard reference book of the building industry—characterized by one witness as the trade "bible"—for information as to products, manufacturers, etc. It further appeared that, before the subcontractor was invited to bid, both the general contractor and the architect had checked Sweet's Catalog for the advertisement made by him of his product.

the cancellation clause did not grant the subcontractor the right to cancel the contract, except where he had submitted and the architect had refused to approve a sample of his window construction, which was of course to be within the architect's general specifications and his own indicative shop drawings, but which beyond this also would embody the standards of his regular trade product in matters of workmanship and other construction details not attempted to be set out in the specifications and shop drawings; that, unless he undertook to submit a sample reflective of these general standards of his product and capable of being considered by the architect for approval or disapproval on this basis, he would not have complied with the condition of the contract, on which alone the right to invoke the cancellation clause was intended to rest; that it was not and could not be claimed in the situation that the rough corner welding, the use of felt for stainless-steel weatherstripping, and the placing of the window lock in the structure so that it was incapable of being securely fastened, constituted the submission of a sample of the "standard construction" of his regular trade product; and that thus no such sample submission and disapproval had occurred as the contract had made the foundation or condition of a right in the subcontractor to cancel.

The issue between the parties thus in effect was whether or not the language, "if Architect does not approve our standard construction, as per sample submitted," was required to be held as a matter of law to mean that the subcontractor was free to embody any standard or quality of workmanship and construction detail which he saw fit, without any relationship to his regular trade product, in such samples as he submitted, and was entitled to have the architect make approval or rejection on this basis. We do not believe that the subcontractor's interpretation—"My standard construction was what I wished to put in the sample, that was the idea of the sample"—was one which it could be said was necessarily compelled in the situation.

Reference has previously been made to the advertising done by the subcontractor of some of the standard aspects of his regular product in the general reference catalog or directory of the industry,[2] and to the fact that this advertisement, as could naturally be expected to be done in the trade, had been consulted by the general contractor and the architect prior to the making of a contract with the subcontractor. Expert testimony was also introduced to show that the term "standard construction" as applied to the building element or product of a manufacturer had the general meaning in the industry of such particular construction as was normally employed in and was characteristic of it in its previous use and recognition by the trade. And further, in relation to the question of ambiguity in the language used—"if Architect does not approve our standard construction, as per sample submitted"—it was entitled to be considered that the meaning for which the subcontractor contended would make the word "standard" an utter redundancy in the cancellation clause, and that the absolutism for which the subcontractor contended could readily have been directly expressed by such simple language as "if Architect does not approve such construction as Subcontractor has used in sample submitted" or, perhaps simpler still, "if Architect does not approve whatever sample Subcontractor may submit."

■■ It is elementary, of course, that a contract will be regarded as ambiguous, if it is reasonably susceptible of different tenable constructions. Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 267. And under Missouri law, where an ambiguity exists in a contract provision, and where the ambiguity cannot be dispelled by a reference to other parts of the contract merely or by a legal appraisal of uncontroverted surrounding circumstances only, the meaning of the provision is a matter for the jury, as a question of resolving factually what the intention of the parties and the terms of the agreement should be regarded as having been. Big 4 Realty Co. v. Clark, 145 Mo.App. 632, 123 S.W. 95;

---

2. See footnote 1, supra.

Yost v. Silvers, 138 Mo.App. 524, 119 S.W. 971; Deutmann v. Kilpatrick, 46 Mo.App. 624.

On all of the foregoing, we are of the opinion that it must be held that the trial court was not required to rule as a matter of law that the contract gave the subcontractor the right to make the sample which he was to submit consist of any character of workmanship and construction detail, not undertaken to be dealt with in the architect's general specifications, that he saw fit, without any relationship to the standards of his regular, advertised window-product—a right which of course would make it possible for him capriciously to escape having to furnish the windows for the buildings, if he became desirous of getting out of the deal which he had made. We think the trial court properly viewed the situation as being one in which the jury was entitled to say whether the intention and terms of the contract were as the plaintiff contended or as contended for by the defendant, and to resolve on this basis whether the subcontractor had rightfully cancelled the contract or had been guilty of a renunciatory breach.

Defendant has cited a number of cases in which the rejection of a sample submitted has been held to give rise to a right of cancellation, but in none of these apparently was the issue specifically involved as to whether the sample itself had been such as the contract obligated the seller to submit. The principal case relied upon is H. Gaus & Sons Mfg. Co. v. Chicago Lumber & Coal Co., 115 Mo.App. 114, 92 S.W. 121, 122. There a buyer had sent a seller an order for No. 2 yellow pine lumber of certain dimensions, with a provision, "Sample cars to decide this order." The seller purported to make acceptance, but with the condition added that the grades and classifications were to be those of the Southern Lumber Manufacturers' Association. The buyer thereafter sent in a request for a shipment. The first two cars received were inspected and rejected and the seller thereupon gave notice of cancellation. The evidence is not shown to have presented any issue as to whether the lumber was in fact No. 2 yellow pine lumber under Southern Lumber Manufacturers' Association grades. And the case cannot be said to hold that the seller could have submitted a sample of some other grade of lumber than was provided for in the contract—for example, No. 3 yellow pine—and that the refusal of the buyer in that situation to accept the sample sent would as a matter of law entitle the seller to make cancellation.

The next contention made is that the court's instruction on damages did not provide the jury with a proper guide for arriving at the amount of a recovery. No objection was interposed to the instruction on this ground at the trial. Defendant merely made the general objection, when the instructions were given, that, on the evidence which the court had admitted, any award of damages which the jury might make would be purely speculative, "predicated upon a mere conjecture or guess," and that therefore it was "error" to give the instruction (and, by implication, any other damage instruction as well).

Under Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A., a party may not on appeal assign as error the giving or the failure to give an instruction, "unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Nor does the situation impress generally as being one in which it is entitled to be said that the contention has such apparent merit otherwise and involves such probable injustice as to prompt a consideration of it on the basis of our own judicial concern and inherent responsibility. We do not examine therefore what technical merit, if any, the contention might have, if timely and appropriate objection on that basis had been interposed to it in the trial court.

The final contention to be considered is that the plaintiff here was without any right to maintain an action upon the bond. The basis of this contention is that the subcontractor's contract and the surety company's bond had been entered into with the general contractor as an individual; that the general contractor had thereafter

incorporated his business and made assignment of the window contract and the performance bond to the organized corporation; that the suit here was one brought by the corporation; that the performance bond could not validly be assigned to the corporation without the surety company's consent; and that therefore no recovery was entitled to be had upon it in the present action.

There was no provision in either the subcontractor's contract or the performance bond prohibiting the general contractor from making an assignment. To the contrary, the parties' intent that the general contractor should have the right to assign the subcontractor's contract was plainly implied by the language of the final clause thereof, that both the general contractor and his "assigns" should be bound "to the full performance of the covenants of this agreement."

The situation thus was one where the language of the contract showed the intention to allow the general contractor to assign the subcontractor's obligation; where there was no provision in the performance bond against the securing obligation of the surety company also being assigned or being operative in case that this was done; and where the burden or risk of the surety company cannot be and is not argued to have been materially increased in any way by the assignment that was made. In these circumstances, we do not think that there exists any question under Missouri law as to plaintiff's right here to bring an action upon the bond for whatever breach the subcontractor may have been guilty of in relation to his contract.

A performance bond executed by a commercial surety company for a building contractor or subcontractor is recognized generally as being in the nature of an insurance contract. Massachusetts Bonding & Ins. Co. v. Feutz, 8 Cir., 182 F.2d 752, 756. And under Missouri law, an insurance contract is in general subject to assignment, except where from its nature it is inherently one of mere personal relationship, or except where the right to assign has been expressly and validly ex-

cluded from the obligation assumed. Rendelman v. Levitt, Mo.App., 24 S.W.2d 211, 213. See also 45 C.J.S., Insurance, § 410, page 36; Restatement, Contracts, § 151.

The judgment must accordingly be affirmed.